1

2

3

4

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6

7

8

9

10

UNITED STATES OF AMERICA,

Plaintiff,

v.

BARTON BUTTERBAUGH,

Defendants.

C14-515 TSZ

ORDER

11

12

13

14

15

16

17

18

THIS MATTER comes before the Court on a motion for summary judgment, docket no. 20, brought by plaintiff United States of America (the "Government").  In this action, the Government seeks a substantial civil penalty from defendant Barton Butterbaugh, M.D. for prescribing controlled substances to individuals in Washington without first obtaining from the Drug Enforcement Administration ("DEA") a registration for Washington.  Having reviewed all papers filed in support of, and in opposition to, the Government's motion,[1] including the supplemental briefs submitted upon the Court's

19

20

21

22

23

_____

[1] Butterbaugh moved to strike portions of the Government's reply and the materials submitted with it.  _See_ Surreply (docket no. 29).  The motion to strike was DENIED, _see_ Minute Order (docket no. 31), for the following reasons.  First, the Government's discussion concerning the different versions of 21 C.F.R. § 1301.12(b)(3) addressed an issue raised by Butterbaugh in his response to the motion for summary judgment, which is an appropriate use of a reply.  Second, the DEA website, which articulates the agency's current policy concerning _locum tenens_, is publicly available; it is not "new evidence" about which Butterbaugh lacked constructive notice before the Government filed its reply.  Butterbaugh has

ORDER - 1

1   request, and having considered the oral arguments of counsel during the hearing held on

2   July 23, 2015, the Court enters the following order.

3   **Background**

4          Butterbaugh resides in Arizona.  Butterbaugh Aff. at ¶ 1 (docket no. 25-2).  He is

5   licensed to practice medicine in Arizona and Washington, and he has a DEA registration

6   for Arizona.  Compl. at ¶¶ 3-4 (docket no. 1).  He does not have a DEA registration for

7   Washington.  _Id._ at ¶ 4; Butterbaugh Aff. at ¶ 18.  During the period from October 2010

8   to November 2012, Butterbaugh treated individuals in Washington who were patients of

9   eClinicMD, a Florida-based company.  Butterbaugh Aff. at ¶¶ 8, 17, & 23.  According to

10  Butterbaugh, in August 2010, the physician employed by eClinicMD to service patients

11  in Washington "suddenly moved" to California, leaving approximately 80 individuals

12

---

13  now had an opportunity to respond to the Government's allegedly late submission, and the Court has
    considered his argument that the obscurity of the relevant page of the DEA website, evidenced by the
14  Government's failure to cite to it in the opening brief, undermines the Government's position that
    Butterbaugh should have known about and heeded the advice on the website.  Third, the travel records
15  that the Government provided with its reply need not be stricken because they do not assist the
    Government.  The flight information does not support any assertion that Butterbaugh misrepresented the
16  frequency of his visits to Seattle, _compare_ Butterbaugh Aff. at ¶ 20 (docket no. 25-2) _with_ Ex. A to
    Zennan Decl. (docket no. 28-1), but rather contradicts the statement in the Government's motion that,
17  between 2010 and 2012, Butterbaugh "traveled to Washington from Arizona approximately once per
    month," Mtn. at 1 (docket no. 20).  Finally, the excerpt from Butterbaugh's deposition in a case for which
18  he served as an expert witness likewise need not be stricken because it does not serve the Government's
    purpose of impeaching him.  In the 1999 deposition, Butterbaugh explained that two individuals had
19  made complaints against him to the Arizona Board of Medical Examiners; the first was a patient who
    claimed he had missed a tubal ovarian problem, but no lawsuit was ever filed, and the second was a
20  woman who falsely alleged a romantic relationship in retaliation for his noting on a form that she was on
    psychotropic medication, which prevented her from getting a job at a hospital.  Butterbaugh Dep. at 20-
21  22, _Carmack v. Hoelscher_, D. Okla. Case No. CJ-97-7074-67, 1999 Depo. Trans. LEXIS 7250, Ex. B to
    Fogg Decl. (docket no. 27-2 at 4-5).  Neither of these complaints contradicts Butterbaugh's representation
22  that, until now, he had never been "accused of an administrative licensing infraction by any medical board
    and/or the Federal Governmental regulating agencies" and had "never been cited by a State Board of
    Pharmacy or the DEA."  Butterbaugh Aff. at ¶ 3 (docket no. 25-2).

23

ORDER - 2

1  without a treatment provider.  _Id._ at ¶ 17.  Butterbaugh agreed to "fill in" until eClinicMD

2  hired a permanent local physician.  _Id._

3         Over the course of the 25 months at issue, Butterbaugh made several trips to

4  Seattle to see patients, and he consulted with patients in Washington via telephone from

5  his office in Arizona.  _Id._ at ¶¶ 20-21.  He estimates that approximately 85-90% of the

6  refills for his Washington patients were authorized from his Arizona office.  _Id._ at ¶ 21.

7  Butterbaugh also states that over 60% of the medications he prescribed during the period

8  at issue for individuals in Washington were not controlled substances.  _See id._ & Ex. I to

9  Resp. (docket no. 25-1 at 26).  According to data compiled by Washington's Prescription

10 Monitoring Program, Butterbaugh has written over 1,300 prescriptions for controlled

11 substances, spread among over 200 people.  _See_ Garrety Decl. at ¶ 7(a) & Ex. A (docket

12 no. 23).

13        Although Butterbaugh applied for and obtained a medical license in Washington

14 before he began to treat patients in Washington, he did not apply for a Washington DEA

15 registration.  Butterbaugh Aff. at ¶ 18.  Butterbaugh contends that he relied on advice

16 provided by an employee of the Washington Department of Health, who allegedly

17 indicated that, because he was temporarily substituting for a recently-departed physician

18 (_i.e._, operating _locum tenens_[2]), Butterbaugh was not required to obtain a separate DEA

19 registration for Washington.  _Id._; _see_ Ex. F to Resp. (docket no. 25-1 at 18-19).

20

21 _____

22 [2] _Locum tenens_ is a Latin phrase that means "holding the place," and it connotes "a deputy; a substitute; a
representative."  Black's Law Dictionary 1025 (9th ed. 2009).

23

1        The prescriptions Butterbaugh issued to Washington patients contained an address

2   in Seattle, an "866" telephone number, a Washington medical license number, and a DEA

3   registration number for Arizona.  _See_ Zennan Decl. at ¶ 4 & Ex. A (docket no. 22).  The

4   "866" telephone number on a prescription issued by Butterbaugh made a pharmacist

5   suspicious, and after the pharmacist contacted the DEA, an investigation commenced in

6   February 2011.  _Id._ at ¶ 3.  Other pharmacists reported concerns in December 2011 and

7   May 2012, and Alan Zend, DO (an osteopath who treats opiate addiction) called the DEA

8   in July 2012 after a patient who had received prescriptions from Butterbaugh admitted to

9   Zend that he was an addict.  _See_ Ex. D to Zennan Decl. (docket no. 22-5).

10        In late November 2012, Assistant United States Attorney ("AUSA") Christina

11   Fogg (née Dimock) wrote to Butterbaugh and informed him that the DEA had been

12   monitoring him and found him to be "routinely out of compliance" with the requirement

13   that he have a DEA registration for Washington.  Ex. N to Fogg Decl. (docket no. 21-2).

14   Butterbaugh was told that the Government was "considering initiating civil litigation"

15   against him, and that he should contact AUSA Fogg to discuss the possibility of pre-

16   litigation settlement.  _Id._  After receiving AUSA Fogg's letter, Butterbaugh immediately

17   ceased treating patients in Washington and issued no further prescriptions to individuals

18   in Washington.  Butterbaugh Aff. at ¶ 23.  In April 2014, the Government commenced

19   this action, pleading one claim for relief under 21 U.S.C. § 842(c), _see_ Compl. (docket

20   no. 1), and it has now moved for summary judgment on both liability and the amount of

21   any civil penalty.

22

23

1    **<u>Discussion</u>**

2       To obtain summary judgment, the Government must demonstrate the absence of

3 any genuine issue of material fact and an entitlement to judgment as a matter of law. <u>*See*</u>

4 Fed. R. Civ. P. 56(a); <u>*see also*</u> <u>*Celotex Corp. v. Catrett*</u>, 477 U.S. 317, 323 (1986).  A fact

5 is material if it might affect the outcome of the suit under the governing law. <u>*E.g.*</u>,

6 <u>*Anderson v. Liberty Lobby, Inc.*</u>, 477 U.S. 242, 248 (1986).  To survive a motion for

7 summary judgment, the adverse party must present "affirmative evidence," which "is to

8 be believed" and from which all "justifiable inferences" are to be favorably drawn. <u>*Id.*</u> at

9 255, 257.  When the record, however, taken as a whole, could not lead a rational trier of

10 fact to find for the non-moving party, summary judgment is warranted. <u>*See*</u> <u>*Danner v.*</u>

11 <u>*Himmelfarb*</u>, 858 F.2d 515, 517 (9th Cir. 1988) (citing <u>*Matsushita Elec. Indus. Co. v.*</u>

12 <u>*Zenith Radio Corp.*</u>, 475 U.S. 574, 587 (1986)).  The Court is satisfied that the questions

13 before it are not factual, but rather legal, in nature.  The issues for decision are (i) whether

14 the Government has stated and proven a cognizable claim for a civil penalty; and (ii) if

15 so, what amount of civil penalty is appropriate.

16      A.     **<u>Liability</u>**

17       The Government seeks to impose a civil penalty against Butterbaugh under a

18 provision of the Comprehensive Drug Abuse Prevention and Control Act of 1970, also

19 known as the Controlled Substances Act ("CSA"), indicating that "any person who

20 violates <u>*this section*</u> shall, with respect to any such violation, be subject to a civil penalty

21 of not more than $25,000."  21 U.S.C. § 842(c)(1)(A) (emphasis added).  As is clear from

22 the statute, a person is subject to a civil penalty under § 842(c) only if the person violated

23

§ 842.  Section 842(a) contains 16 subsections defining different unlawful acts.  In its

Complaint, the Government did not indicate which of these 16 subsections, if any, it

alleged Butterbaugh violated.  In its motion for summary judgment and its supplemental

brief, however, the Government relies solely on § 842(a)(1), which prohibits any person

subject to registration requirements from distributing or dispensing[3] a controlled

substance in violation of 21 U.S.C. § 829.  *See* 21 U.S.C. § 842(a)(1).

      To establish a violation of § 842(a)(1), the Government must prove that

Butterbaugh (i) was subject to registration requirements, and (ii) either distributed or

dispensed controlled substances in violation of § 829.  With respect to the latter element,

the Government contends that dispensing controlled substances without a "valid"

prescription constitutes a violation of § 829.  The relevant subsections of § 829, however,

do not contain the word "valid," but rather make a distinction between schedule II

controlled substances (which may be dispensed by a practitioner directly to an ultimate

user or upon a "written" prescription that may not be refilled) and schedule III and IV

substances (which may be dispensed directly or upon either a "written" or an "oral"

prescription that may be refilled up to five times within six months of the prescription).

21 U.S.C. §§ 829(a) & (b); *see also United States v. Moore*, 423 U.S. 122, 137 n.13

(1975) ("On its face § 829 addresses only the form that a prescription must take.").

---

[3] The term "dispense" means "to deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance." 21 U.S.C. § 802(10).  The term "distribute" means "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical." *Id.* at § 802(11).  The terms "deliver" or "delivery" mean "the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship." *Id.* at § 802(8).

When viewed, however, in the context of the applicable statutes and regulations, the question presented is not whether the prescriptions that Butterbaugh issued were valid,[4] but rather whether they were, in fact, "prescriptions." If the slips of papers that Butterbaugh gave to his patients in Washington were not "prescriptions," then regardless of whether controlled substances were thereby obtained by these individuals, Butterbaugh distributed (as opposed to dispensed) controlled substances without a prescription, which constitutes a violation of § 829, and in turn, a violation of § 842(a)(1). _See_ 21 U.S.C. §§ 802(8) & (11) (together defining "distribute" to mean "the actual, constructive, or attempted transfer of a controlled substance" other than by administering or dispensing it).

The parties have not cited any cases directly on point.[5] Although "prescription" is not statutorily defined, a regulation provides that a prescription may be issued only by

---

[4] The Government does not allege that Butterbaugh dispensed controlled substances by means of the Internet, which is governed by the only subsection of § 829 in which the term "valid" appears. See 21 U.S.C. § 829(e)(1). Dispensing via the Internet requires a "valid" prescription, defined as one issued for "a legitimate medical purpose" and "in the usual course of professional practice" by a practitioner who has conducted at least one in-person medical evaluation of the patient. 21 U.S.C. §§ 829(e)(1) & (2). The Government has offered no evidence that Butterbaugh issued any prescription for other than "a legitimate medical purpose," outside "the usual course of professional practice," or without having first examined the patient. Thus, the Government's contention that the prescriptions written by Butterbaugh were not "valid," as statutorily defined, lacks merit.

[5] The Government relies on _Advance Pharm., Inc. v. United States_, 391 F.3d 377 (2d Cir. 2004), and _United States v. Poulin_, 926 F. Supp. 246 (D. Mass. 1996). In _Advance Pharm._, a corporation and its president and vice-president unsuccessfully appealed a $2 million civil penalty for violating 21 U.S.C. § 842(a)(10), which renders unlawful the negligent failure to "keep a record or make a report" or "self-certify," as required by 21 U.S.C. § 830. _See_ 391 F.3d at 382-83. A jury found that the defendants had violated § 842(a)(10) by failing to notify the DEA with respect to 141 of their 159 pseudoephedrine shipments to new customers. _Id._ at 389. In _Poulin_, the proprietor of a pharmacy was ordered, following a bench trial, to pay civil penalties for multiple violations of 21 U.S.C. § 842(a)(5), which defines as unlawful the refusal or negligent failure to "make, keep, or furnish" a required record. 926 F. Supp. at 252 & 255. The defendant was found to have committed 36 recordkeeping violations, for which he was

ORDER - 7

"an individual practitioner" who is "[a]uthorized to prescribe controlled substances by the jurisdiction in which he [or she] is licensed to practice" and is either registered with the DEA or exempt from registration. *See* 21 C.F.R. § 1306.03(a); *see also* 21 U.S.C. § 821 (authorizing the Attorney General to promulgate regulations relating to the registration and control of the distribution and dispensing of controlled substances). A different regulation mandates that every prescription for a controlled substance bear "the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a). The crux of the dispute in this case is whether Butterbaugh was "registered" and had inscribed on his forms a "registration number" within the meaning of §§ 1306.03(a) & 1306.05(a).

The Court concludes that Butterbaugh was required to, but undisputedly failed to, obtain a registration in Washington. The CSA requires every person who dispenses controlled substances to obtain a registration from the Attorney General. 21 U.S.C. § 822(a)(2). A separate registration is required "at each principal place of business or professional practice" where the person dispenses controlled substances. *Id.* at § 822(e)(1). The DEA has, by regulation, defined various locations that are *not* places where controlled substances are dispensed, including an office "used by a practitioner (who is registered at another location in the same State or jurisdiction of the United States) where controlled substances are prescribed but neither administered nor otherwise dispensed . . . and where no supplies of controlled substances are maintained." 21 C.F.R.

---

fined a total of $50,000, representing penalties ranging from $1,000 to $25,000, depending on the type of violation. *Id.* at 255. In both *Advanced Pharm.* and *Poulin,* the sanctioned parties were found in violation of a provision other than the one at issue here, *i.e.,* § 842(a)(1).

1   § 1301.12(b)(3).[6]  Because Butterbaugh was not registered at any location in Washington,

2   this regulation does not remove the Seattle offices used by Butterbaugh from the ambit of

3   places where controlled substances were dispensed.

4          Because controlled substances were dispensed in the Seattle offices, Butterbaugh

5   needed a registration in Washington if the Seattle offices were, for him, a "principal place

6   of business or professional practice."  _See_ 21 U.S.C. § 822(e)(1).  The phrase "principal

7   place of business or professional practice" is not defined by statute or regulation.  The

8   DEA has, however, issued a "Dear Applicant" letter indicating that "[a] practitioner who

9   _maintains_ professional practices in multiple states is deemed to have established a

10  principal place of business or professional practice in each state."  Ex. H to Resp. (docket

11  no. 25-1 at 24) (emphasis added).  According to the DEA, the term "maintains" connotes

12  "a continuing, ongoing place of business or professional practice as opposed to a one-

13  time or temporary one," and "[a]ny location in separate states" at which "a practitioner

14  distributes or dispenses controlled substances is a 'principal place of business or

15  professional practice' requiring separate DEA registration."  _Id._  The DEA, however, has

16  acknowledged that a physician "who _occasionally_ prescribes in another state and who

17  does not maintain a practice there is not required to be registered in that state," allowing

18

   _____

19  [6] This regulation was amended in 2006 to narrow the scope of locations deemed not to be places where
20  controlled substances are dispensed.  Section 1301.12(b)(3) previously excluded an office "used by a
    practitioner (who is registered at another location)."  The regulation was modified to exempt only an
21  office "used by a practitioner (who is registered at another location _in the same State or jurisdiction of the
    United States_)."  (Emphasis added.)  This change did not affect the portion of the regulation (or the CSA)
    requiring a separate registration for only principal places of business or professional practice, and the
22  2006 revision to § 1301.12(b)(3) has little relevance to the issues before the Court.

23

ORDER - 9

1   for a physician to "work in a locum tenens capacity in multiple states without having to

2   obtain a DEA registration in each state." _Id._ (emphasis added).  The term "occasionally"

3   was understood by the DEA to mean "on occasion," and not "permanent" or "regular."

4   _Id._

5          The Court is satisfied that the DEA's interpretation with respect to the phrase

6   "principal place of business or professional practice" is a reasonable construction of

7   § 822(e) of the CSA.  _See_ _Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc._,

8   467 U.S. 837, 843-44 (1984) (if a statute "is silent or ambiguous with respect to the

9   specific issue, the question for the court is whether the agency's answer is based on a

10  permissible construction of the statute" and, when a particular question has been

11  implicitly delegated to an agency, "a court may not substitute its own construction of a

12  statutory provision for a reasonable interpretation made by the administrator of an

13  agency").  Butterbaugh distributed or dispensed controlled substances at the two Seattle

14  offices he used, and each of these locations constituted a "principal place of business or

15  professional practice."  Butterbaugh's activities in Washington were conducted far more

16  frequently than "on occasion."  Although Butterbaugh might have initially intended

17  merely to temporarily "fill in" for the departed physician, his role became more

18  "permanent."  Over the course of 25 months, Butterbaugh engaged in a "continuing,

19  ongoing," and "regular" practice in Washington, which he might to this day still

20  "maintain" but for the November 2012 cease-and-desist letter.  The Court rules, as a

21  matter of law, that Butterbaugh did not have the requisite registration in Washington,

22  improperly used his Arizona registration number on the forms he gave to patients in

23

1  Washington, and distributed controlled substances in Washington, between October 2010

2  and November 2012, without a prescription, in violation of §§ 829 & 842(a)(1).[7]

3  **B.    Civil Penalty**

4  Having concluded that the Government has established, as a matter of law, that

5  Butterbaugh violated § 842(a)(1), the Court turns to an assessment of the appropriate

6  amount for a civil penalty.  The Ninth Circuit has not yet had occasion to consider how a

7  civil penalty under § 842(c) should be calculated.  The cases cited by the Government,

8  however, recite the same four factors for determining the amount of such civil penalty,

9  namely (1) the level of the defendant's culpability; (2) whether and to what extent the

10  defendant profited from the unlawful conduct; (3) the harm to the public; and (4) the

11  defendant's financial capacity to pay a penalty.  _Advance Pharm._, 391 F.3d at 399;

12  _Poulin_, 926 F. Supp. at 253.  During oral argument, the Government acknowledged that it

13  has no further evidence to present concerning the size of a civil penalty.  The Court is

14  persuaded that the factors outlined in _Advance Pharm._ and _Poulin_ and the current record

15  support only a relatively small civil penalty.

16  _____

17  [7] _United States v. Clinical Leasing Serv., Inc._, 930 F.2d 394 (5th Cir. 1991), which was cited by the
Government, is not controlling.  Contrary to the Government's assertion, _Clinical Leasing_ did not define

18  "principal place of business or professional practice," but rather rejected the individual defendants'
argument that the regulation concerning locations "deemed not to be places where controlled substances
are . . . dispensed" was unconstitutionally vague.  _Id._ at 395-96.  The Fifth Circuit held that the

19  registration regulations, which exempted an office at which _inter alia_ "controlled substances are
prescribed but neither administered nor otherwise dispensed as a _regular part_ of the professional practice
of the practitioner at such office," _id._ at 395 (emphasis added), might "in some cases" be "unclear," but

20  they were not "impermissibly vague in _all_ of their applications" or with respect to the individual
defendants in the case, _id._ at 395-96 (emphasis in original).  In using the example of a physician who
"intends to dispense controlled substances from a particular location several times a week or month," _id._

21  at 395, the Fifth Circuit was addressing the meaning of the clause "regular part of the professional
practice of the practitioner," which is a similar concept, but is not the statutory phrase at issue in this case.

22

23

1      **1.**    <u>**Culpability**</u>

2        The Government asserts that Butterbaugh's conduct was willful because (i) he was

3  aware of the "separate registration" requirement, having previously registered in New

4  Mexico, Nevada, and Texas, as well as Arizona, <u>see</u> Zennan Decl. at ¶ 4 (docket no. 22),

5  and (ii) he continued to violate the CSA after receiving AUSA Fogg's cease-and-desist

6  letter.  The Government's evidence does not establish any willfulness on Butterbaugh's

7  part.  With respect to his previous, now expired, registrations for states other than

8  Arizona, the Government provides no dates or other details.  Such registrations might

9  have been for different periods over the course of Butterbaugh's 34-year medical career,

10  demonstrating an awareness that he needed to have a DEA registration for the state in

11  which he resided, as opposed to another state in which he also treated patients.

12        Indeed, in his affidavit, Butterbaugh indicates that, from 1983 until 1986, he was

13  an Army Medical Corps Officer stationed in El Paso, Texas, <u>see</u> Butterbaugh Aff. at ¶ 2

14  (docket no. 25-2), and his defunct registration in Texas might have related to his duties

15  for the Army, before he established a practice in Arizona.  In 1986, Butterbaugh practiced

16  emergency medicine in Grants, New Mexico, which would explain why he once had a

17  DEA registration for New Mexico.  <u>See</u> Butterbaugh Dep. at 23, Ex. B to Fogg Decl.

18  (docket no. 27-2 at 5).  Thus, contrary to the Government's suggestion, any "justifiable

19  inferences" from Butterbaugh's prior registrations in New Mexico, Nevada, and Texas

20  do not support a finding of willfulness.

21        For the proposition that Butterbaugh's unlawful conduct persisted after receipt of

22  AUSA Fogg's letter, the Government cites only an announcement apparently posted on

23

ORDER - 12

eClinicMD's website in January 2013, stating that Butterbaugh "will no longer travel to

Seattle" and "will focus on his Arizona and Texas practices." Ex. C to Zennan Decl.

(docket no. 22-5). Because Butterbaugh did not at that time have a registration in Texas,

the Government contends that Butterbaugh continued to issue prescriptions for controlled

substances without having the requisite registration. The Government, however, has

provided no evidence that Butterbaugh wrote any prescriptions for controlled substances

after November 2012 in either Washington or Texas. In contrast, Butterbaugh has

averred that he restricted his practice to Arizona and "did not so much as set foot in the

State of Texas" after receiving AUSA Fogg's letter. Butterbaugh Aff. at ¶ 24 (docket

no. 25-2).

        The Government has offered no evidence that Butterbaugh manifested a belief in,

adopted, or authorized the eClinicMD announcement, so as to render it non-hearsay. *See*

Fed. R. Evid. 801(d)(2). The Government also has not demonstrated that the eClinicMD

notice would be admissible under any exception to the hearsay rule. *See* Fed. R. Civ.

P. 56(c)(4). The eClinicMD announcement was received by a DEA investigator in an

e-mail from an unidentified undercover agent, *see* Zennan Decl. at ¶ 7 (docket no. 22),

and it is therefore not a business record, *see* Fed. R. Evid. 803(6), but rather is the type of

unreliable evidence that the hearsay rule was designed to exclude. The statement by

eClinicMD with respect to a "Texas practice" might simply have been erroneous, and it

does not support the Government's assertion that Butterbaugh continued to engage in

offending conduct after November 2012.

1       Not only has the Government failed to present evidence of willfulness, but

2   Butterbaugh has also raised doubts about his level of culpability.  Butterbaugh has

3   essentially invoked the defense of entrapment by estoppel,[8] which requires a showing that

4   (1) an authorized government official empowered to render the advice at issue, (2) who

5   was made aware of all the relevant historical facts, (3) affirmatively told Butterbaugh the

6   allegedly proscribed conduct was permissible, (4) he relied on the advice, and (5) his

7   reliance was reasonable.  _See_ _United States v. Schafer_, 625 F.3d 629, 637 (9th Cir. 2010);

8   _United States v. Batterjee_, 361 F.3d 1210, 1216 (9th Cir. 2004).  Reliance is reasonable

9   when a person "sincerely desirous of obeying the law would have accepted the

10  information as true, and would not have been put on notice to make further inquiries."

11  _Batterjee_, 361 F.3d at 1216-17.

12      Butterbaugh contends he was told by an employee of Washington's Department of

13  Health that he qualified for the _locum tenens_ "exception" to the requirement of separate

14  registrations for each state in which a practice is maintained.  The Government replies

15  that a state employee's interpretation of a federal regulation has no legal impact, but it

16  cites no authority for such proposition.  Individuals who are not even government

17  employees can have the requisite authority for purposes of the entrapment-by-estoppel

18

19  _____

20  [8] Butterbaugh did not plead entrapment by estoppel as an affirmative defense in his answer.  _See_ Answer
    at ¶¶ 19-22 (docket no. 8).  Even if Butterbaugh were deemed to have waived this defense, _see_ Fed. R.
21  Civ. P. 8(c)(1) (requiring that affirmative defenses be affirmatively pleaded), the elements of entrapment
    by estoppel would still be relevant to Butterbaugh's level of culpability, which is a factor in the penalty,
22  as opposed to the liability, stage.

23

ORDER - 14

1   doctrine,[9] and whether the state employee at issue was authorized or empowered to

2   advise Butterbaugh that a DEA registration for Washington was not required cannot be

3   determined on this record.[10]  For purposes of the Government's motion for summary

4   judgment, the Court draws all reasonable inferences in favor of Butterbaugh and

5   concludes that the Government has not proven that his violations of §§ 829 and 842(a)(1)

6   were willful.

7                        2.   **Profit**

8        The Government asserts Butterbaugh's profit from his activities in Washington

9   was at least $81,170.  The Government has computed this figure from the following

10  information.  Butterbaugh received from eClinicMD $125 for each initial face-to-face

11  examination, $90 for each follow-up examination, and $45 for each telephonic

12  consultation.  Ex. G to Fogg Decl. (docket no. 21-1 at 65).  The Government estimates

13  that Butterbaugh saw at least 136 patients in Washington.  Mtn. at 8 (docket no. 20)

14  _____

15  [9] _See_ _Batterjee_, 361 F.3d at 1217 (recognizing that licensed firearms dealers are the equivalent of federal
    agents with regard to the dissemination of information concerning whether a person is eligible to purchase
16  a firearm); _United States v. Tallmadge_, 829 F.2d 767, 774 (9th Cir. 1987) ("a buyer has the right to rely
    on the representations of a licensed firearms dealer" concerning eligibility to "receive and possess a
    weapon" after a "felony conviction has been reduced to a misdemeanor").

17  [10] _See_ _United States v. Washington_, 2012 WL 4602838 at *3 (D. Mont. Oct. 2, 2012) (holding that
18  whether a drug investigator with the Flathead Tribal Police, who was a member of the Northwest Drug
    Task Force, a multi-jurisdictional entity, was acting as an authorized federal agent when he provided
    erroneous advice about federal law was an issue for the trier of fact); _see also_ _United States v. Christie_,
19  2013 WL 6860835 at *5 (D. Haw. Dec. 30, 2013) (requiring defendants to make a proffer concerning
    their entrapment-by-estoppel defense premised on statements made by state and county officials
    concerning the manufacturing and distribution of marijuana for religious purposes); _cf._ _United States v._
20  _Shinderman_, 2006 WL 522105 at *29 (D. Me. Mar. 2, 2006) (concluding that an estoppel-by-entrapment
    defense premised on the DEA's "allegedly confusing regulation," namely the pre-amendment version of
21  21 C.F.R. § 1301.12(b)(3), could not be dispositively addressed in connection with the defendant's
    motion to dismiss a 68-count indictment), _adopted in part and modified in part on other grounds_, 432 F.
22  Supp. 2d 149 (D. Me. 2006).

23

ORDER - 15

1    (citing Ex. A to Zennan Decl. (docket nos. 22-1, 22-2, 22-3, & 22-4), which contains

2    photocopies of 152 prescriptions).  The Government arrives at a sum of $17,000 in

3    connection with initial visits ($125 x 136) and a sum of $64,170 for subsequent services

4    (assuming all other prescriptions were issued after telephonic consultations[11]), for a total

5    of $81,170.  The Government contends that Butterbaugh's expenses need not be

6    considered, stating without proof that airline tickets and hotel expenses were covered by

7    eClinicMD, but the Court is not persuaded that it can simply ignore Butterbaugh's

8    overhead, including telephone bills, and it does not, in any event, view the estimated

9    profit as justifying the substantially higher civil penalty that the Government requests.

10                    **3.    <u>Harm to the Public</u>**

11            The Government describes two types of public harm allegedly stemming from

12   Butterbaugh's failure to obtain a Washington registration:  (i) the DEA's ability to

13   monitor and investigate Butterbaugh's activities was impeded; and (ii) controlled

14   substances with a "street value" of at least $1.7 million were dispensed.  The Government

15   contends that Butterbaugh's conduct is consistent with the operation of a "pill mill."  <u>See</u>

16   Zennan Decl. at ¶ 13 (docket no. 22).  Butterbaugh used temporary or "pop-up" locations,

17   namely an acupuncture clinic and a chiropractor's office, relied on eClinicMD to provide

18   him with medical records about his own patients, required patients to pay for visits in

19   advance, did not accept insurance, listed eClinicMD's telephone number on his

20   _____

21   [11] Butterbaugh contends that any wages he earned from telephonic consultations were necessarily related
22   to activities he conducted in Arizona, not Washington.

23

ORDER - 16

1   prescription forms, and serviced individuals who traveled hundreds of miles to see him

2   rather than seeking treatment in their local area.  *Id.*  According to the Government, these

3   behaviors are indicia of running a "pill mill."

4       Butterbaugh responds that his Arizona DEA registration number, Washington

5   medical license number, and Washington address were on each form that he gave a

6   patient, rendering the Government's accusation that he somehow evaded DEA oversight

7   "preposterous," Resp. at 17 (docket no. 25), particularly when the Government itself

8   waited for over a year and nine months after initiating its investigation to send him a

9   cease-and-desist letter.  Butterbaugh also calls the "street value" of the controlled

10  substances he distributed "irrelevant," *id.*, because the Government has provided no

11  evidence that any of these medications made their way to the street, and he points out

12  that, despite having the names and contact information for Butterbaugh's patients, the

13  Government has not even alleged, let alone proven, that the controlled substances at issue

14  were distributed or dispensed for other than legitimate medical purposes.[12]  Butterbaugh

15  acknowledges that "pill mills" and prescription drug abuse are harmful to the public, but

16  he denies being responsible for these general societal ills.  The Court concludes that the

17  "public harm" factor does not weigh in favor of a high penalty.

18

19  ───────────────

20  [12] Butterbaugh has explained that he treats patients with chronic pain, many of whom are elderly and
    unable to obtain appropriate medications because of "the current climate of fear in the medical

21  profession."  Butterbaugh Aff. at ¶ 29 (docket no. 25-2).  Butterbaugh indicates that he "did what [he]
    could, and what was medically sound, to weed" out individuals who abuse drugs.  *Id.*  According to

22  Butterbaugh, "[i]f some doctors have prescribed controlled medications irresponsibly, I am not one of
    them."  *Id.*

23

ORDER - 17

1          4.    **<u>Financial Capacity</u>**

2          Rather than providing evidence concerning Butterbaugh's assets, the Government

3 asks the Court to ignore the jurisprudence concerning motions for summary judgment and

4 to draw adverse inferences against the non-moving party for declining to answer certain

5 discovery requests.  The Government, however, neither moved to compel discovery nor

6 deposed Butterbaugh, and it concedes that no further discovery may be conducted in this

7 case.  <u>See</u> Minute Order (docket no. 10) (setting a discovery deadline of April 13, 2015).

8 The Government may not shift the burden to Butterbaugh to establish that he is unable to

9 pay a penalty, and it has not proven that Butterbaugh has the financial capacity to pay a

10 substantial civil penalty.

11         In contrast, Butterbaugh has provided a financial statement indicating that his

12 home is worth $1,133,500, but has a mortgage of $1,247,596, and that he has six motor

13 vehicles, two of which have outstanding loan balances exceeding their fair market value,

14 a recreational vehicle on which more is owed than it is worth, retirement accounts

15 holding in the aggregate approximately $420,000, and a time share valued at $17,500 on

16 which $16,490 remains due.  Ex. G to Resp. (docket no. 25-1 at 20-21).  He also has over

17 $45,000 in credit card and medical equipment debts.  <u>Id.</u>  Butterbaugh is not currently

18 working, having recently had surgery to address the symptoms of spinal disease, and his

19 wife is also in poor health.  Butterbaugh Aff. at ¶¶ 27-28 (docket no. 25-2).  The Court

20 concludes that the appropriate amount of a civil penalty is $7,500, which constitutes a

21 manageable debt in light of Butterbaugh's limited assets and substantial financial

22 liabilities.  This sum also represents a fair civil penalty given Butterbaugh's low level of

23

culpability, his meager profits, and the absence in the record of any concrete or particularized harm to the public.

**Conclusion**

For the foregoing reasons, the Government's motion for summary judgment, docket no. 20, is GRANTED in part and DENIED in part.  The Clerk is DIRECTED to enter judgment in favor of the Government and against Butterbaugh in the amount of $7,500 and otherwise consistent with this Order.  The Clerk is further DIRECTED to send a copy of this Order to all counsel of record and to CLOSE this case.

IT IS SO ORDERED.

Dated this 5th day of August, 2015.

Thomas S. Zilly
United States District Judge